WO          IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

RODNEY SCOTT WILBER,                    )
                                        )
                        Plaintiff,      )
                                        )
        vs.                             )
                                        )
CAROLYN W. COLVIN, Acting               )
Commissioner of Social Security,        )
                                        )      No. 2:15-cv-0760-HRH
                        Defendant.      )
_____ )

O R D E R

        This is an action for judicial review of the denial of disability benefits under Title II

of the Social Security Act, 42 U.S.C. §§ 401-434.  Plaintiff has timely filed his opening brief,[1]

to which defendant has responded.[2]  Oral argument was requested but is not deemed

necessary.

Procedural Background

        Plaintiff is Rodney Scott Wilber.  Defendant is Carolyn W. Colvin, acting

Commissioner of Social Security.

        In August 2012, plaintiff filed an application for disability benefits under Title II of

the Social Security Act.  Plaintiff alleged that he became disabled on May 10, 2012.  Plaintiff

_____

        [1]Docket No. 20.

        [2]Docket No. 24.

alleged that he is disabled because of chronic lumbar/cervical pain, post status multilevel fusion, tremors, chronic spinal pain, and cervical disc disease. Plaintiff's application was denied initially and upon reconsideration. After a hearing on June 9, 2014, an administrative law judge (ALJ) denied plaintiff's claims. On March 4, 2015, the Appeals Council denied plaintiff's request for review, thereby making the ALJ's September 18, 2014 decision the final decision of the Commissioner. On April 27, 2015, plaintiff commenced this action.

## General Background

Plaintiff was born on June 22, 1960. He was 53 years old at the time of the hearing. Plaintiff has a high school education. Plaintiff is married and lives with his wife, who is disabled because of a bad car accident, and his adult nephew, who does not work due to severe PTSD. Plaintiff's past relevant work includes work as a pipefitter/welder, a real estate agent, a bartender, and a waiter.

Attached as an appendix is the court's digest of the medical evidence and other evidence in the administrative record.

## The ALJ's Decision

The ALJ first found that plaintiff met "the insured status requirements of the Social Security Act through September 30, 2017."[3]

---

[3]Admin. Rec. at 15.

The ALJ then applied the five-step sequential analysis used to determine whether an individual is disabled.[4]

At step one, the ALJ found that plaintiff had "not engaged in substantial gainful activity since May 10, 2012, the alleged onset date...."[5]

At step two, the ALJ found that plaintiff had "the following severe impairments: status post cervical fusion, status post lumbar fusion, obesity, and essential tremor of the

---

[4]The five steps are as follows:

> Step one: Is the claimant presently engaged in substantial gainful activity?  If so, the claimant is not disabled. If not, proceed to step two.
> Step two: Is the claimant's alleged impairment sufficiently severe to limit ... h[is] ability to work?  If so, proceed to step three.  If not, the claimant is not disabled.
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1?  If so, the claimant is disabled. If not, proceed to step four.
> Step four: Does the claimant possess the residual functional capacity ("RFC") to perform ... h[is] past relevant work? If so, the claimant is not disabled.  If not, proceed to step five.
> Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow ... h[im] to adjust to other work that exists in significant numbers in the national economy?  If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

[5]Admin. Rec. at 15.

right upper extremity...."[6]  The ALJ found plaintiff's adjustment disorder with anxiety nonsevere, in part because he had only mild restrictions in activities of daily living, no significant difficulties with social functioning, mild difficulties with concentration, persistence, and pace, and no episodes of decompensation.[7]

At step three, the ALJ found that plaintiff did "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1...."[8]  In particular, the ALJ considered whether plaintiff met Listing 1.04 (disorders of the spine).[9]

"Between steps three and four, the ALJ must, as an intermediate step, assess the claimant's RFC."  Bray v. Comm'r Soc. Sec. Admin., 554 F.3d 1219, 1222-23 (9th Cir. 2009). The ALJ found that plaintiff had

> the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) subject to the following[:]  He can frequently operate foot controls with the right lower extremity; he can occasionally climb ramps or stairs, but should avoid climbing ladders, ropes, or scaffolds; he can occasionally balance, stoop, kneel, and crouch, but should avoid crawling; he can occasionally reach overhead, and frequently finger and feel with the bilateral upper extremities;

_____

[6]Admin. Rec. at 15.

[7]Admin. Rec. at 15-16.

[8]Admin. Rec. at 16.

[9]Admin. Rec. at 17.

> and he should avoid concentrated exposure to nonweather
> related extreme cold, excessive vibration, unprotected heights
> that are high or exposed, and dangerous machinery with
> moving mechanical parts, except motor vehicles.[10]

The ALJ found plaintiff's pain and symptom statements less than credible because "[t]he medical evidence indicates that the claimant's spinal impairments precede the alleged onset date by a number of years[,]" plaintiff's pain improved with medication and was "stable with the use of Oxycodone," there was evidence that might suggest symptom exaggeration, and his self-reported limitations were not supported by the record.[11]

The ALJ gave significant weight[12] to opinion of Dr. Peetoom.[13]  The ALJ also gave significant weight[14] to the opinions of Dr. Lazorwitz[15] and Dr. Zuess.[16]  And, the ALJ gave

---

[10]Admin. Rec. at 17.

[11]Admin. Rec. at 18-19.

[12]Admin. Rec. at 19.

[13]On May 29, 2013, Greg A. Peetoom, Ph.D., examined plaintiff.  Dr. Peetoom opined that plaintiff had no limitations as regards understanding and memory, sustained concentration and persistence, social interaction, and adapting to change.  Admin. Rec. at 457.

[14]Admin. Rec. at 20.

[15]On June 3, 2013, Nicole Lazorwitz, Psy.D., opined that plaintiff's anxiety disorder was non-severe.  Admin. Rec. at 58.

[16]On September 24, 2013, Jonathan Zuess, M.D., opined that plaintiff's anxiety disorder was non-severe.  Admin. Rec. at 79-80.

significant weight[17] to the opinions of Dr. Combs[18] and Dr. Griffith.[19]  The ALJ gave some

weight[20] to Dr. Donlon's opinion.[21]  The ALJ gave little weight[22] to Dr. Horrocks' opinion.[23]

And, the ALJ gave minimal weight[24]  to the testimony of Linda Lundgren.[25]

At step four, the ALJ found that plaintiff was "capable of performing past relevant

_____

[17]Admin. Rec. at 20.

[18]On June 18, 2013, Charles Combs, M.D., opined that plaintiff could occasionally lift/carry 20 pounds; frequently lift/carry 10 pounds; stand/walk for 6 hours; sit for 6 hours; could never climb ladders/ropes/scaffolds; could occasionally climb ramps/stairs; could occasionally balance, stoop, kneel, and crouch; could never crawl; was limited as to reaching overhead; was limited as to fingering and feeling; and should avoid concentrated exposure to extreme cold and vibration.  Admin. Rec. at 63-64.

[19]On September 26, 2013, Ernest Griffith, M.D., opined that plaintiff could occasionally lift/carry 20 pounds; frequently lift/carry 10 pounds; stand/walk for 6 hours; sit for 6 hours; never climb ladders/ropes/scaffolds; occasionally climb ramps/stairs; occasionally balance, stoop, kneel, and crouch; never crawl; was limited as to overhead reaching, fingering, and feeling; and should avoid concentrated exposure to extreme cold, vibration, and hazards.  Admin. Rec. at 82-83.

[20]Admin. Rec. at 20.

[21]On June 1, 2013, Stacy Donlon, M.D., examined plaintiff.  Dr. Donlon opined that plaintiff could occasionally lift/carry 10 pounds; frequently lift/carry less than 10 pounds; could stand/walk for 6-8 hours; could sit for 6-8 hours; and had no limitations as to climbing, balancing, stooping, kneeling, crouching, crawling, reaching, handling, fingering and feeling.  Admin. Rec. at 464-466.

[22]Admin. Rec. at 20.

[23]Dr. Horrocks' opinion is discussed in detail below.

[24]Admin. Rec. at 20.

[25]Lundgren, a former co-worker of plaintiff's, submitted a third-party statement. Admin. Rec. at 254.

work as a real estate agent, bartender, or waiter."[26]   This finding was based on the

testimony of the vocational expert.[27]   The ALJ also made an alternative step five finding

that plaintiff could work as an order taker.[28]

Thus, the ALJ concluded that plaintiff had "not been under a disability, as defined

in the Social Security Act, from May 10, 2012, through the date of this decision...."[29]

<u>Standard of Review</u>

Pursuant to 42 U.S.C. § 405(g), the court has the "power to enter, upon the pleadings

and transcript of the record, a judgment affirming, modifying, or reversing the decision of

the Commissioner...."   The court "properly affirms the Commissioner's decision denying

benefits if it is supported by substantial evidence and based on the application of correct

legal standards."   <u>Sandgathe v. Chater</u>, 108 F.3d 978, 980 (9th Cir. 1997).   "Substantial

evidence is 'more than a mere scintilla but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'"   <u>Id.</u>

(quoting <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1039 (9th Cir. 1995)).   "'To determine whether

substantial evidence supports the ALJ's decision, [the court] review[s] the administrative

---

[26]Admin. Rec. at 21.

[27]Admin. Rec. at 21.   Kathy Atha testified as the vocational expert.   Admin. Rec. at 47-50.

[28]Admin. Rec. at 21.

[29]Admin. Rec. at 21.

record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion.'" <u>Id.</u> (quoting <u>Andrews</u>, 53 F.3d at 1039). If the evidence is susceptible to more than one reasonable interpretation, the court must uphold the Commissioner's decision. <u>Id.</u> But, the Commissioner's decision cannot be affirmed "'simply by isolating a specific quantum of supporting evidence.'" <u>Holohan v. Massanari</u>, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098 (9th Cir. 1999)).

<u>Discussion</u>

Plaintiff first argues that the ALJ erred in giving Dr. Horrocks' opinion little weight. On January 31, 2013, Dr. Horrocks opined that plaintiff could walk one block, could sit for 2 hours, could stand/walk for less than 2 hours, would need to be able to shift positions during the day, would need to take 2-3 unscheduled breaks every day for between 15-60 minutes, could occasionally lift less than 10 pounds, could never look up or down, could rarely turn his head right or left, could never twist, stoop or crouch, could rarely climb ladders or stairs, could grasp on the right 25% of the day, could grasp on the left 50% of the day, could finger on the right 50% of the day, could finger on the left 75% of the day, could reach out in front 90% of the day on the right, could reach out in front 50% of the day on the left, could reach overhead 25% of the day, would be "off task" 25% of the day, would be capable of low stress work, and would be absent from work more than four days per

month.[30]

Dr. Horrocks was a treating physician.  "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant."  Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).  But, "if the treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject this opinion without providing 'specific and legitimate reasons' supported by substantial evidence in the record for so doing."  Id. (quoting Murray v. Heckler, 722 F.2d 499, 502 (9th Cir. 1983)).  Dr. Horrocks' opinion was contradicted by the opinions of Dr. Donlon, Dr. Combs, and Dr. Griffith.  Thus, the ALJ was required to give specific and legitimate reasons for rejecting Dr. Horrocks' opinion.

The ALJ gave Dr. Horrocks' opinion little weight because 1) it was "not supported by the objective findings of other medical sources, including specialists in neurology [Dr. Vehra] and neurosurgery [Dr. Kellogg];" 2) it was not consistent with his treatment notes which "regularly describe the claimant as healthy-appearing, in no acute distress and with normal gait, station and muscle strength[;]" 3) Dr. Horrocks did not provide any "explanation for his assessments of the claimant's functioning," and 4) "the functional limitations he assigns are so restrictive, that they appear to be sympathetic rather than

---

[30]Admin. Rec. at 338-340.  Dr. Horrocks' opinion can be found at page 12 of the Appendix.

objective and dispassionate."[31]  Plaintiff argues that none of these were specific and legitimate reasons for rejecting Dr. Horrocks' opinion.

The first reason given by the ALJ was that Dr. Horrocks' opinion was not consistent with Dr. Vehra's and Dr. Kellogg's objective findings as well as other objective findings in the record.  The ALJ's general finding that Dr. Horrocks' opinion was not consistent with other objective findings in the records is not sufficient.  "To say that medical opinions are not supported by sufficient objective findings or are contrary to the preponderant conclusions mandated by the objective findings does not achieve the level of specificity our prior cases have required."  Embrey v. Bowen, 849 F.2d 418, 421 (9th Cir. 1988).  An "ALJ must do more than offer h[er] conclusions.  [She] must set forth h[er] own interpretations and explain why they, rather than the doctors', are correct."  Id. at 421-22.

As for Dr. Vehra's and Dr. Kellogg's objective findings, the ALJ did not expressly indicate which of their findings contradicted Dr. Horrocks' opinion.  Rather, the ALJ cited to two exhibits in the record, Exhibit 2F and Exhibit 5F.

Exhibit 2F contains Dr. Vehra's treatment notes from plaintiff's December 10, 2012 and January 8, 2013 visits, the results of the January 24, 2013 nerve conduction study, and the results of plaintiff's December 2012 brain and head MRIs.[32]  The ALJ does not indicate

---

[31]Admin. Rec. at 20.

[32]Admin. Rec. at 321-335.  These records can be found at pages 4-6 of the Appendix.

whether all of the objective findings in the foregoing records contradict Dr. Horrocks' opinion or whether only some of the objective findings do.  Perhaps the ALJ was referring to the fact that Dr. Vehra noted that plaintiff had a normal nerve conduction study, but as plaintiff points out, Dr. Vehra did not doubt that plaintiff had an essential tremor, but rather only stated that, after nerve conduction studies ruled out an organic cause, anxiety was the probable cause for plaintiff's tremor.[33]

Exhibit 5F contains Dr. Kellogg's treatment notes from May 9, 2013 and a May 20, 2013 letter to Dr. Horrocks updating him on plaintiff's progress after his C4-5 ACDF.[34] Again, the ALJ does not indicate which objective findings contradicted Dr. Horrocks' opinion.  The ALJ may have been referring to Dr. Kellogg's note that plaintiff "tolerated the [May 2013 surgical] procedure well" and was neurologically "stable."[35]  But "a condition can be stable [and still] disabling."  Petty v. Astrue, 550 F. Supp. 2d 1089, 1099 (D. Ariz. 2008).

All the ALJ did here is state her conclusion that Dr. Horrocks' opinion was contradicted by the objective medical evidence in the record, which is not sufficient.  The ALJ was required to identify specific objective findings and explain how those findings

---

[33]Admin. Rec. at 387.

[34]Admin. Rec. at 447-451.  This evidence can be found at pages 24-26 of the Appendix.

[35]Admin. Rec. at 449.

contradicted Dr. Horrocks' opinion.  Because the ALJ did not do so, her first reason for rejecting Dr. Horrocks' opinion was not specific and legitimate.

The second reason given by the ALJ was that Dr. Horrocks' opinion was not supported by his treatment notes, which "regularly describe the claimant as healthy-appearing, in no acute distress and with normal gait, station and muscle strength."[36] First of all, it is not surprising that Dr. Horrocks often found that plaintiff was not in "acute" distress, given that plaintiff's neck and back conditions were chronic conditions.  The ALJ also seems to have ignored the fact that Dr. Horrocks' treatment notes are replete with findings of muscle spasms, back and neck pain, abnormal lordosis, and restricted range of motion.[37]  The ALJ cannot cherry-pick certain findings in a physician's treatment notes and ignore the rest.  Ghanim v. Colvin, 763 F.3d 1154, 1164  (9th Cir. 2014).  But even if she could, the ALJ must explain how those certain findings are inconsistent with specific limitations that the doctor assessed.  The ALJ did not explain how normal gait and station and muscle strength were at odds with the limitations that Dr. Horrocks assessed.  Rather, she simply listed some of Dr. Horrocks' findings from his treatment notes as the basis for her conclusion that his opinion, as a whole, was inconsistent with his treatment notes.  This is not sufficient.  Thus, the second reason given by the ALJ for rejecting Dr. Horrocks'

---

[36]Admin. Rec. at 20.

[37]Admin. Rec. at 347, 352, 355, 360, 470, 472, 494, 503, 506, 509, 513 & 516.

opinion was not specific and legitimate.

The third reason given by the ALJ, that Dr. Horrocks did not explain his opinion, was not legitimate.  On the form that Dr. Horrocks used to express his opinion, he explained that plaintiff had moderate back pain and right arm and leg pain with some numbness; that the "signs, findings, and associated symptoms" of plaintiff's impairments were tenderness, muscle spasm, chronic fatigue, sensory loss, impaired sleep, abnormal posture, drops things, and reduced grip strength; and that the "objective signs" were limited range of motion, positive straight leg raising test, tenderness, muscle spasm, muscle weakness, and weight change.[38]  These statements provide an adequate explanation of the basis for Dr. Horrocks' opinion.

The fourth reason the ALJ gave for rejecting Dr. Horrocks' opinion was that Dr. Horrocks appeared to be more sympathetic rather than objective and dispassionate. "[U]nder certain circumstances the ALJ may consider the purpose for which a doctor's report was obtained."  Nguyen v. Chater, 100 F.3d 1462, 1464 (9th Cir. 1996).  However, defendant "'may not assume that doctors routinely lie in order to help their patients collect disability benefits.'"  Lester, 81 F.3d at 832 (quoting Ratto v. Secretary, 839 F. Supp. 1415, 1426 (D. Or. 1993)).  And, "there is nothing remarkable about the fact that a doctor advocates his patient's cause."  Petty, 550 F. Supp. 2d at 1099.  Moreover, Dr. Horrocks'

---

[38]Admin. Rec. at 336-337.

opinion was based on his objective findings, and not just on plaintiff's reported symptoms. "[W]hen an opinion is not more heavily based on a patient's self-reports than on clinical observations, there is no evidentiary basis for rejecting the opinion." Garrison v. Colvin, 763 F.3d 1154, 1162 (9th Cir. 2014). Thus, the fourth reason the ALJ gave for rejecting Dr. Horrocks' opinion was not legitimate.

Plaintiff next argues that the ALJ erred in finding his pain and symptom statements less than credible. "An ALJ engages in a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible." Garrison, 759 F.3d at 1014. "'First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged.'" Id. (quoting Lingenfelter, 504 F.3d at 1035-36). "In this analysis, the claimant is not required to show 'that h[is] impairment could reasonably be expected to cause the severity of the symptom []he has alleged; []he need only show that it could reasonably have caused some degree of the symptom.'" Id. (quoting Smolen, 80 F.3d at 1282). "Nor must a claimant produce 'objective medical evidence of the pain or fatigue itself, or the severity thereof.'" Id. (quoting Smolen, 80 F.3d at 1281). "If the claimant satisfies the first step of this analysis, and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'" Id. at

1014-15 (quoting Smolen, 80 F.3d at 1281). "This is not an easy requirement to meet: 'The clear and convincing standard is the most demanding required in Social Security cases.'" Id. at 1015 (quoting Moore v. Comm'r of Soc. Sec. Admin., 278 F.3d 920, 924 (9th Cir. 2002)). "In evaluating the claimant's testimony, the ALJ may use 'ordinary techniques of credibility evaluation.'" Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (quoting Turner v. Comm'r of Social Sec., 613 F.3d 1217, 1224 n.3 (9th Cir. 2010)). "For instance, the ALJ may consider inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct, unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment, and whether the claimant engages in daily activities inconsistent with the alleged symptoms[.]" Id. (internal citations omitted).

The ALJ found plaintiff's pain and symptom statements less than credible because 1) "[t]he medical evidence indicates that the claimant's spinal impairments precede the alleged onset date by a number of years[,]" 2) plaintiff's pain improved with medication and was "stable with the use of Oxycodone," 3) there was evidence that might suggest symptom exaggeration, and 4) his self-reported limitations were not supported by the medical record.[39] Plaintiff argues that none of these were clear and convincing reasons.

As for the first reason given by the ALJ, that plaintiff's spinal problems preceded his alleged onset date, the ALJ seemed to be inferring that if plaintiff could work when he first

---

[39]Admin. Rec. at 18-19.

had spinal problems, he should be able to work now.  But such an inference is not supported by record.  Plaintiff's spinal problems got worse over time as evidenced by the additional surgery he had in 2013.[40]  This was not a clear and convincing reason to find plaintiff's pain and symptom statements less than credible.

As for the second reason, that plaintiff's pain improved with medication and that his condition was "stable" on Oxycodone, the Ninth Circuit has noted that reporting improvement is "unlikely behavior for a person intent on overstating the severity of h[is] ailments."  Reddick v. Chater, 157 F.3d 715, 724 (9th Cir. 1998).  And as noted above, "stable" does not mean not disabling.  In other words, plaintiff's pain could still have been as severe as he alleged even though it was "stable" on Oxycodone.  This was not a clear and convincing reason to find plaintiff's pain and symptom statements less than credible.

As for the third reason, that the record suggested symptom exaggeration, the ALJ cited to Dr. Vehra's January 8, 2013 treatment note that stated that plaintiff "gave a poor effort during a right hand grip test, and that his tremors would resolve with lack of attention, rather than rest."[41]  One reference to plaintiff making a "poor effort" on a grip strength test is not sufficient evidence from which to conclude that plaintiff might be exaggerating his symptoms.  This was not a clear and convincing reason to find plaintiff's

---

[40]Admin. Rec. at 555.

[41]Admin. Rec. at 19.

pain and symptom statements less than credible.

As for the fourth reason, that plaintiff's pain and symptom statements were not supported by the record, the ALJ explained that plaintiff's claim that he needs to takes naps for 4-5 hours per day "is wholly unsupported in the longitudinal treatment notes," that if his claim that he needed to lie down about 80% of the time "were to be believed ... it could be reasonably expected for the medical records to show evidence of deconditioning, muscle weakness, or even muscle atrophy[,]" and that "contrary to  the claimant's complaints of balance problems, the primary care reports do not report him with gait instability, but describe him as ambulating normally."[42]  In other words, the ALJ found that plaintiff's pain and symptom statements were not supported by the medical evidence of record.  Although lack of medical evidence is a factor "the ALJ can consider in h[er] credibility analysis," it cannot "form the sole basis for discounting pain testimony[.]"  Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005).  Because the other three reasons given by the ALJ were not clear and convincing, even if this fourth reason were clear and convincing, it would be insufficient to support the ALJ's credibility finding.

Because the ALJ erred as to Dr. Horrocks' opinion and plaintiff's credibility, the court must determine whether to remand this matter for further proceedings or for an award of benefits.  Plaintiff argues that a remand for an award of benefits would be

---

[42]Admin. Rec. at 18.

-17-

appropriate here.

The court follows a three-step analysis to determine whether a remand for an award of benefits would be appropriate. "First, [the court] must conclude that 'the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion.'" Brown-Hunter v. Colvin, 806 F.3d 487, 495 (9th Cir. 2015) (quoting Garrison, 759 F.3d at 1020). "Second, [the court] must conclude that 'the record has been fully developed and further administrative proceedings would serve no useful purpose.'" Id. (quoting Garrison, 759 F.3d at 1020). "Third, [the court] must conclude that 'if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.'" Id. (quoting Garrison, 759 F.3d at 1021). But, "even if all three requirements are met, [the court] retain[s] 'flexibility' in determining the appropriate remedy" and "may remand on an open record for further proceedings 'when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act.'" Id. (quoting Garrison, 759 F.3d at 1021).

As for the first step, the court has concluded that the ALJ failed to give legally sufficient reasons for rejecting Dr. Horrocks' opinion and for finding plaintiff's pain and symptom statements not credible.

As for the second step, defendant argues that further development of the record is necessary because when the record as a whole is reviewed there are significant conflicts in

the evidence.  Defendant then suggests that on remand, the ALJ could give more weight to Dr. Donlon's opinion and that if she did so, plaintiff would not be disabled.

Defendant is basically arguing that a remand for further proceedings would be appropriate here so that the ALJ could "revisit the medical opinions and testimony that she rejected for legally insufficient reasons" but Ninth Circuit "precedent and the objectives of the credit-as-true rule foreclose the argument that a remand for the purpose of allowing the ALJ to have a mulligan qualifies as a remand for a 'useful purpose'...." Garrison, 759 F.3d at 1021.  Nor would allowing the ALJ a second chance to assess plaintiff's credibility qualify as a remand for a useful purpose.  See Moisa v. Barnhart, 367 F.3d 882, 887 (9th Cir. 2004) ("The Commissioner, having lost this appeal, should not have another opportunity to show that Moisa is not credible any more than Moisa, had he lost, should have an opportunity for remand and further proceedings to establish his credibility").  The record is fully developed and further administrative proceedings would serve no useful purpose in this case.

As for the third step, the limitations that Dr. Horrocks assessed are facially inconsistent with even sustained sedentary work.  Thus, if Dr. Horrocks' opinion were credited as true, the ALJ on remand would be required to find plaintiff disabled.  Similarly, if plaintiff's pain and symptom statements were credited as true, the ALJ on remand would be required to find plaintiff disabled.  Plaintiff testified that he sleeps between 4-5 hours

during the daytime[43] and the vocational expert testified that there would be no work for someone who needs to lay down at least 4-5 hours in an eight-hour work day.[44]

Finally, the court's review of the record as a whole does not create serious doubt as to whether plaintiff is disabled.  Thus, a remand for an award of benefits is appropriate in this case.

Conclusion

Based on the foregoing, the Commissioner's decision is reversed and this matter is remanded for an award of benefits.

DATED at Anchorage, Alaska, this 31st  day of March, 2016.

/s/ H. Russel Holland
United States District Judge

---

[43]Admin. Rec. at 40.

[44]Admin. Rec. at 49-50.

APPENDIX

I.  Physical Impairments

A.  Treating physicians

1.  Kellogg Brain and Spine/Dr. Jordi Kellogg

On June 20, 2008, plaintiff's MRI of his lumbar spine showed that "[t]here is a disc bulge with broad based right paracentral and lateral disc protrusion as well as articular facet degeneration at L5-S1.  This results in impingement on the central and right aspect of the thecal sac, right lateral recess and right neural foramen.  Minimal disc bulge with articular facet degeneration L4-5 is less likely to be clinically significant."[1]

On June 20, 2008, Dr. Kellogg "reviewed with Mr. Wilber and his wife the lumbar MRI and discussed the findings.  I went over his treatment options, including evaluation of the hip with x-rays which we are ordering today on his way out, in that he points towards the front of his hip where it hurts.  His back pain is the greatest complaint and likely the hip pain is related to his back, but I want to rule out hip pathology.  We also went over the possibility of a right L5-S1 epidural steroid injection, although this will be transient, particularly [given] his long-standing symptom complex and the size of the disk, unlikely to be [e]ffective versus a right L5-S1 microdiskectomy and I went over the procedure with him in detail and a full PAR-Q was performed.  I asked that he consider his

---

[1]Admin. Rec. at 578.

-1-

options carefully and if, at some point, he would like to proceed with this, he would call us back to schedule it."[2]

On June 20, 2008, x-rays of plaintiff's right hip were normal.[3]

On September 3, 2008, plaintiff had a right L5-S1 microdiskectomy.[4]

On April 20, 2010, an MRI of plaintiff's lumbar spine showed that "[t]he signal changes in the L5-S1 vertebral body and L5-S1 disc demonstrates low T1 and high T2 signal and enhancement.  The appearance is consistent with endplate degeneration changes and disc degeneration.  The appearance is less likely for diskitis.  Status post right-sided unilateral laminotomy at the L5-S1 level.  There is a small amount of granulation tissue overlying the recurrent disc protrusion centrally and in bilateral neural foramen.  The disc protrusion in bilateral neural foramen may contact bilateral L5 nerve root.  There is also a right-sided neural foraminal broad-based disc protrusion at the L4-L5 level that may contact the right L4 nerve root.  Mild lumbar spine epidural lipomatosis.  Incidental finding of a small nodular T2 hyperintensity in the right kidney…, not completely evaluated.  Renal ultrasound may be useful."[5]

---

[2]Admin. Rec. at 552.

[3]Admin. Rec. at 579.

[4]Admin. Rec. at 559.

[5]Admin. Rec. at 571-572.

On May 19, 2010, plaintiff had a right L5-S1 transforaminal epidural steroid injection.[6]

On May 26, 2010, plaintiff reported that he did not receive more than 50% pain relief from the injection.[7]

On June 23, 2010, an MRI of plaintiff's cervical spine showed "[a]nterior plate and interbody fusions spanning C5 through C7. Alignment is preserved. Degenerative changes at C5-C6 cause moderate to severe bilateral neural foraminal narrowing."[8]

On June 23, 2010, a renal ultrasound showed a "[s]mall right renal cyst measuring 9 mm."[9]

On June 28, 2010, plaintiff "return[ed] to the clinic for ongoing follow-up of his low back pain and lower extremity radiculopathy in an S1 pattern. We have reviewed the MRI that he had ... that demonstrates degenerative disk disease at 5-1, modic end-plate changes, foraminal narrowing, some recurrent disk. From a treatment standpoint, I feel it would require an L5-S1 anterior lumbar interbody fusion using PEEK cage, Actifuse, and a plate. I went over the procedure with him in detail and a full PAR-Q was performed. He would

---

[6]Admin. Rec. at 545.

[7]Admin. Rec. at 543.

[8]Admin. Rec. at 574.

[9]Admin. Rec. at 576.

like to proceed with this, pending authorization.  He would see Dr. Don Giles for a pre-operative evaluation as co-surgeon for the anterior approach.  He has undergone physical therapy and injections, but unfortunately has not responded with sufficient or significant relief.  Examination was nonfocal.  We reviewed his neck MRI because he has been having some neck pain and upper extremity dysesthesia, particularly on the right side.  Examination of his upper extremities demonstrated quite weak hand grip of 4-/5 and some diminished right biceps reflex.  He has a cervical MRI that demonstrates some disk osteophyte complex resulting in some foraminal narrowing at the adjacent level of his prior fusion at 5-6, 6-7."[10]

On July 13, 2010, plaintiff had a "L5-S1 anterior diskectomy, decompression, interbody fusion using PEEK cage, Actifuse, and anterior instrumentation with plate."[11]

On May 9, 2013, plaintiff "returns to clinic for followup for his ongoing neck pain and upper extremity radiculopathy, right greater than left, with an intention tremor.  He gets numbing dysesthesias and tingling down his arms.  He has significant neck pain.  He has a prior history of a C5-7 ACDF performed years ago.  He rates his pain a 4/10.  He had a diskogram, which is positive at C4-5.  He had an MRI of the cervical spine which

---

[10]Admin. Rec. at 549.

[11]Admin. Rec. at 555.

demonstrates stenosis bilaterally at C4-5, both centrally and in the lateral foramina."[12]

Plaintiff's physical exam showed that his "[c]ervical range of motion [was] markedly diminished, particularly to extension and lateral bending with a positive Spurling sign to the right.  Upper extremity motor strength significant for 4-/5 right hand grip and 4/5 left hand grip.  He has an intention tremor on the right.  Reflexes are trace right biceps, 1+ left biceps, trace B triceps.  Negative Hoffman sign.  Sensory is intact to light touch."[13]  Lower extremity strength was 5/5.[14]  "Reflexes 1+ B patellar and Achilles.  Downgoing toes.  No clonus.  Intact pulses.  Normal gait and stance."[15]  Dr. Kellogg noted that plaintiff "has failed a more conservative approach and tincture of time with progression in his symptoms.  From a treatment standpoint, I feel he would be a good candidate for removal of the plate from C5-7 and performance of a C4-5 ACDF using PEEK cage, allograft, iliac crest bone marrow aspirate, and plate.  I went over the procedure with him in detail, and a full PAR-Q was performed.  He would like to proceed with this, pending authorization. We will schedule it."[16]

Plaintiff had surgery on May 16, 2013, which consisted of removal of screw from

---

[12]Admin. Rec. at 450.

[13]Admin. Rec. at 451.

[14]Admin. Rec. at 451.

[15]Admin. Rec. at 451.

[16]Admin. Rec. at 451.

plate at C5, C4-C5 anterior cervical microdiscectomy, decompression, interbody fusion, and anterior instrumentation.[17]

On May 20, 2013, plaintiff came in for a "postoperative followup after his C4-5 ACDF. He tolerated the procedure well. He continues with his tremor. Neurologically he is stable. His incision is healing well. We are going to get an x-ray in 3 months, lateral and cervical. He is going to start increasing activities as tolerated."[18]

2.  Dr. Horrocks

Steven C. Horrocks, D.O., was plaintiff's primary care physician.

On December 29, 2011, plaintiff "complain[ed] of a lump on the right foot near the fifth digit. He has been told his cholesterol is a little high in the past."[19] Plaintiff's physical exam was unremarkable except for tenderness at the right fifth metatarsal head.[20] Dr. Horrocks' assessment was pain in the joint, ankle, and foot.[21] X-rays of plaintiff's right foot showed healed fracture deformity involving the base of the distal fax of the right great toe, no acute fracture or dislocation, and focal soft tissue edema adjacent to the lateral right fifth

---

[17]Admin. Rec. at 475.

[18]Admin. Rec. at 449.

[19]Admin. Rec. at 365.

[20]Admin. Rec. at 365.

[21]Admin. Rec. at 366.

MTP joint.[22]

On April 7, 2012, plaintiff reported heartburn, arthralgias/joint pain, and back pain.[23] His physical exam was unremarkable except for some muscle spasms in his back.[24]  Dr. Horrocks' assessments were hyperlipidemia, esophageal reflux, elevated blood pressure reading without diagnosis of hypertension, overweight, and tobacco use disorder.[25]

On May 12, 2012, plaintiff "present[ed] for follow up.  He was attacked at home on 5/10/2012 by a [roommate's] friend.  [P]olice were called and he was taken to the ER.  He was kicked in left arm[,] face and chest.  He had negative x-rays.[[26]]  He has a lot of bruising in the left arm and chest.  [H]e is in a lot of pain.  [H]e was given T#3 at the ER but did not fill them because I asked him not to take tylenol due to his LFT's.  He is having a lot of neck

---

[22]Admin. Rec. at 423.

[23]Admin. Rec. at 362.

[24]Admin. Rec. at 363.

[25]Admin. Rec. at 363.

[26]Plaintiff's May 10, 2012 cervical x-ray taken at the ER showed "[n]o gross evidence of acute bony injury involving the cervical spine[,]" [s]traightening of the normal cervical lordosis," and "[s]tatus post anterior fusion extending from C5-C7.  Suspected chronic changes with respect to the C6 vertebral body."  Admin. Rec. at 409.  X-rays of plaintiff's lumbar spine showed "[n]o gross evidence of acute bony injury involving the lumbar spine[,]" "[s]traightening of the normal lumbar lordosis," and "[p]ostsurgical changes involving L5-S1."  Admin. Red. at 409.

pain and stiffness."[27]  Plaintiff's physical exam showed muscle spasms in his neck and back, extensive bruising to the left shoulder and anterior arm, and an abrasion on the left chin without infection.[28]  Dr. Horrocks' assessments included tobacco use disorder; pain in joint, multiple sites; cervicalgia; lumbago; and spasm of muscle.[29]

On May 17, 2012, plaintiff reported "pain in the left anterior chest for 3 days, sharp stabbing pain with motion, sneeze, cough.  He was in a fight a week ago and is recovering. [N]o dizziness, shortness of breath, sweating or radiation[.]"[30]  His physical exam showed "extensive bruising to the left shoulder and anterior arm.  No hematoma.  Abrasion left chin without infection."[31]  Dr. Horrocks' assessment was tietze's disease.[32]

On May 21, 2012, the ultrasound of plaintiff's abdomen showed "[d]iffuse increased echogenicity of the liver parenchyma, nonspecific but compatible with an element of fatty infiltration and/or hepatocellular disease."[33]

On May 31, 2012, an MRI of plaintiff's cervical spine showed prior anterior fusion

---

[27]Admin. Rec. at 360.

[28]Admin. Rec. at 360-361.

[29]Admin. Rec. at 361.

[30]Admin. Rec. at 357.

[31]Admin. Rec. at 358.

[32]Admin. Rec. at 358.

[33]Admin. Rec. at 421.

and discectomy involving C5, C6, and C7; mild narrowing of the right neural foramen secondary to uncinate spurring and facet joint anthropathy at C3-C4 but no central canal stenosis; and mild mass effect upon the ventral aspect of the cervical cord with mild central canal stenosis and moderate bilateral foraminal narrowing at C4-C5.[34]

On May 31, 2012, plaintiff's MRI of his lumbar spine showed mild broad-based bulge with superimposed small right foraminal protrusion and annular tear at L4-L5 but no contribution to central or foraminal stenosis; and mild narrowing of the right neural foramen without central canal stenosis at L5-S1.[35]

On August 2, 2012, plaintiff "present[ed] for follow up. [H]e has had GI evaluation and was diagnosed with fatty liver. It was recommended to update his hepatitis vaccines. We will do that in our office. [H]e is having worse pain in the neck and back. [H]e is not able to get comfortable sitting, standing, or laying. [H]e is not able to work because of the pain and stiffness."[36] His physical exam showed that he had muscle spasms in his neck and back, abnormal lordosis and range of motion in his back, and paraspinal tenderness.[37] Dr. Horrocks' assessments were displacement of thoracic or lumbar intervertebral disc without

---

[34]Admin. Rec. at 417-418.

[35]Admin. Rec. at 420.

[36]Admin. Rec. at 355.

[37]Admin. Rec. at 355.

myelopathy, degeneration of cervical intervertebral disc, nonalcoholic liver disease, and essential hypertension.[38]

On September 19, 2012, plaintiff reported back and neck pain and weakness and numbness in his right hand.[39]  His physical exam showed muscle spasms in his neck and back, abnormal lordosis and range of motion in his back, and paraspinal tenderness.[40]  Dr. Horrocks' assessments were essential hypertension, hyperlipidemia, overweight, tobacco use disorder and displacement of thoracic or lumbar intervertebral disc without myelopathy.[41]

On November 19, 2012, plaintiff reported that he continues to have neck and back pain and weakness and numbness in his right hand and that "he is having tremors in the right that are getting worse, started in the thumb and now spreading to the other fingers and the hand."[42]  Plaintiff's physical exam showed that he had muscle spasms in his neck, cogwheeling in the right arm, impaired finger-to-nose coordination, intention and resting tremors, abnormal lordosis and range of motion in his back, muscle spasms in his back, and

---

[38]Admin. Rec. at 355-356.

[39]Admin. Rec. at 352.

[40]Admin. Rec. at 352.

[41]Admin. Rec. at 353.

[42]Admin. Rec. at 349.

paraspinal tenderness.[43]   Dr. Horrocks' assessments were displacement of thoracic or lumbar intervertebral disc without myelopathy and abnormal involuntary movements.[44]

On January 31, 2013, plaintiff reported that he "continues to have pain in the neck, low back and radiation to the right upper and lower ext.  [H]e has numbness in the right thumb and index finger on and off.  He has to change positions every 1-2 hours.  [H]e has about 2 bad days a week.  [O]n his good days he has fair function.  [O]n bad days, he really doesn't leave the house.  He has seen neuro and is working on a second opinion with his neuro surgeon.  [H]e has been diagnosed with essential tremor and this is much worse on the right side."[45]  Plaintiff's physical exam showed that he was mildly depressed and had nuchal rigidity and muscle spasms in his neck, cogwheeling in the right arm, asymmetric reflexes, impaired finger-to-nose coordination, resting and intention tremors, abnormal lordosis and range of motion in his back, paraspinal tenderness, a positive straight leg raising test, and muscle spasms in his back.[46]  Dr. Horrocks' assessments were displacement of thoracic or lumbar intervertebral disc without myelopathy and essential and other

---

[43]Admin. Rec. at 349-350.

[44]Admin. Rec. at 350.

[45]Admin. Rec. at 346.

[46]Admin. Rec. at 346-347.

specified forms of tremor.[47]

On January 31, 2013, Dr. Horrocks opined that plaintiff could walk one block, could sit for 2 hours, could stand/walk for less than 2 hours, would need to be able to shift positions during the day, would need to take 2-3 unscheduled breaks every day for between 15-60 minutes, could occasionally lift less than 10 pounds, could never look up or down, could rarely turn his head right or left, could never twist, stoop or crouch, could rarely climb ladders or stairs, could grasp on the right 25% of the day, could grasp on the left 50% of the day, could finger on the right 50% of the day, could finger on the left 75% of the day, could reach out in front 90% of the day on the right, could reach out in front 50% of the day on the left, could reach overhead 25% of the day, would be "off task" 25% of the day, would be capable of low stress work, and would be absent from work more than four days per month.[48] Dr. Horrocks also noted that several of plaintiff's medications caused drowsiness and that plaintiff's impairment to his cervical spine caused right occipital headaches lasting approximately 8 hours 3 times per week.[49]

On May 28, 2013, plaintiff "present[ed] for surgery follow up. [H]e had cervical fusion 05/16/2013 and cleanup of his prior fusion. He has no improvement yet in pain or

---

[47]Admin. Rec. at 347.

[48]Admin. Rec. at 338-340.

[49]Admin. Rec. at 337-338.

radicular symptoms in the arms.  He continues to have significant pain in the low back.  He is using sparing oxycodone and flexeril.  [H]e has not shown any drug seeking behavior."[50] Plaintiff's physical exam showed that he was overweight, in moderate distress, was mildly depressed, and had nuchal rigidity and muscle spasms in his neck, hypertonicity in his right arm, asymmetric reflexes, impaired finger-to-nose coordination, intentional and resting tremors, abnormal lordosis and range of motion in the back, paraspinal tenderness, positive straight leg raising on the right, and muscle spasms in the back.[51]

On July 24, 2013, plaintiff came in "for Xray referral for neck fusion FU, reports rash LT arm x 4 days."[52]  Plaintiff also reported back pain and neck pain and right hand numbness and weakness.[53]  Plaintiff's physical exam showed that he was in moderate distress and mildly depressed and had nuchal rigidity and muscle spasms in the neck, hypertonicity in the right arm, asymmetric reflexes, impaired finger-to-nose coordination, resting and intentional tremors, abnormal lordosis and range of motion in his back, paraspinal tenderness and muscle spasms in his back.[54]  Dr. Horrocks' assessments were degeneration of cervical intervertebral disc and displacement of thoracic or lumbar

---

[50]Admin. Rec. at 472.

[51]Admin. Rec. at 472.

[52]Admin. Rec. at 468.

[53]Admin. Rec. at 469.

[54]Admin. Rec. at 469-470.

intervertebral disc without myelopathy.[55]

August 26, 2013 x-rays of plaintiff's cervical spine showed "[n]o instability ... on flexion or extension views.  There is a loss of normal cervical lordosis which may be secondary to muscle spasm or positioning.  Prior ACDF with interbody bone grafts at C5-C6 and C6-C7 disc spaces and anterior plate and screws.  ACDF at C4-C5 with interbody disc spacer and anterior metallic fusion device."[56]

On September 24, 2013, plaintiff reported that "he continues to have pain in the neck.  [H]e has very limited range of motion.  [H]e tried to work in the garage the other day, just light work, he had much worse pain afterward.  [H]is tremor is a little better today.  It does interfere with feeding himself at times.  He is stable on his medicine at this time.  [H]e still has considerable pain but is dealing with it with reduced activity and medication[.]"[57]  His physical exam showed that he was overweight, in mild distress, and had neck pain with motion, nuchal rigidity and muscle spasms in the neck, hypertonicity of the right arm, asymmetric reflexes, impaired finger-to-nose coordination, resting and intentional tremors, abnormal lordosis and range of motion in the back, paraspinal

---

[55]Admin. Rec. at 473.

[56]Admin. Rec. at 481.

[57]Admin. Rec. at 493.

tenderness, and muscle spasms in the back.[58] Dr. Horrocks' assessments were degeneration of cervical intervertebral disc, abnormal involuntary movements, hyperlipidemia, benign essential hypertension, and abnormal glucose.[59]

On October 28, 2013, plaintiff reported that he "is stable on oxycodone, no new symptoms.  He is having a little more pain with the cold weather, still smoking.  [H]e has [cut] down ... to less than 1/2 ppd.  He did not take his bp medicine today."[60]  Plaintiff's physical exam showed that he was overweight, in moderate distress, mildly depressed and had nuchal rigidity and muscle spasms in the neck, hypertonicity in the right arm, asymmetric reflexes, impaired finger-to-nose coordination, resting and intentional tremors, an excoriated vesicular rash on the right upper anterior arm, abnormal lordosis and range of motion in the back, paraspinal tenderness, and muscle spasms in the back.[61]   Dr. Horrocks' assessments were degeneration of cervical intervertebral disc and benign essential hypertension.[62]

On November 27, 2013, plaintiff reported that he "continues to have pain in the neck and back.  [H]e is having nerve type pain in the hands and feet.  [H]e did not tolerate

---

[58]Admin. Rec. at 494.

[59]Admin. Rec. at 494.

[60]Admin. Rec. at 508.

[61]Admin. Rec. at 509.

[62]Admin. Rec. at 509.

neurontin in the past.  [H]e is due for pain medicine refill."[63]  Plaintiff's physical exam

showed that he was overweight, in moderate distress, mildly depressed, and had nuchal

rigidity and muscle spasms in the neck, hypertonicity in the right arm, asymmetric reflexes,

impaired finger-to-nose coordination, intention and resting tremors, an excoriated vesicular

rash on the right upper anterior arm, abnormal lordosis and range of motion in the back,

paraspinal tenderness, and muscle spasms in the back.[64]  The assessments were displace-

ment of lumbar intervertebral disc without myelopathy and degeneration of cervical

intervertebral disc.[65]

On January 7, 2014, plaintiff reported that "he is struggling with pain control.  [H]e

is getting shooting burning, electric pain in the right foot and right hand.  [H]e is not

sleeping well due to the pain.  [D]id not tolerate neurontin at low dose[.]"[66]  His physical

exam showed that he was overweight, in moderate distress, mildly depressed and had

nuchal rigidity and muscle spasms in the neck, hypertonicity in the right arm, asymmetric

reflexes, impaired finger-to-nose coordination, resting and intentional tremors,  abnormal

lordosis and range of motion in his back, paraspinal tenderness, and muscle spasms in his

--------

[63]Admin. Rec. at 505.

[64]Admin. Rec. at 506.

[65]Admin. Rec. at 506.

[66]Admin. Rec. at 503.

back.[67] Dr. Horrocks' assessments were displacement of lumbar intervertebral disc without myelopathy, spasms, and neuropathy.[68]

On January 21, 2014, plaintiff "present[ed] with nausea, headache, and coughing for 3 days.... He states that they came on gradually.  He states that his cough is more dry.  He is blowing out a clear to yellow mucus occasionally, but not a significant amount.  He has some ear pain and fullness, but this comes and goes.  He has had some body aches.  Denies fever, D/V."[69]  Plaintiff's physical exam showed that he was obese, fatigued, his neck was tender, lungs had decreased breath sounds and coarseness throughout, he had epigastric discomfort, and paraspinal tenderness in the thoracic and lumbar area.[70]  Dr. Horrocks' assessment was cough and he prescribed antibiotics.[71]

On March 31, 2014, plaintiff reported that "[h]is back and neck are not improving. [H]e continues to have pain everyday, poor exercise endurance.  He can only do minor things in the yard for about 10 minutes and has to stop due to pain.  His pain medicine is helping.  [H]is amitriptyline is helping with his neuropathy pain at night.  He has some

---

[67]Admin. Rec. at 503.

[68]Admin. Rec. at 504.

[69]Admin. Rec. at 500.

[70]Admin. Rec. at 500-501.

[71]Admin. Rec. at 501.

during the day.  [D]id not tolerate gabapentin.[72]  His physical exam showed that he was overweight, in moderate distress, mildly depressed, and had nuchal rigidity and muscle spasms in the neck, hypertonicity in the right arm, asymmetric reflexes, impaired finger-to-nose coordination, resting and intentional tremors, abnormal lordosis and range of motion in the back, paraspinal tenderness, and muscle spasms in the back.[73]  Dr. Horrocks' assessments were displacement of lumbar intervertebral disc without myelopathy and degeneration of cervical intervertebral disc.[74]

On April 30, 2014, plaintiff reported that "[h]e has had 2 episodes of difficulty urinating.  He was getting out of a car about 4 weeks ago and had immediate back pain. [T]his has improved some.  He had a second episode 1 week ago, severe back pain both times with trouble urinating for 2 days [after] each episode.  Some mild dysuria.  [N]o fever, nausea, vomiting, or diarrhea, on and off constipation.[75]  Plaintiff's physical exam showed that he was overweight, in moderate distress, mildly depressed, and had nuchal rigidity and muscle spasms in the neck, decreased dorsiflexion in the right foot, asymmetric reflexes, impaired finger-to-nose coordination, resting and intentional tremors, abnormal

---

[72]Admin. Rec. at 515.

[73]Admin. Rec. at 515-516.

[74]Admin. Rec. at 516.

[75]Admin. Rec. at 512.

-18-

lordosis and range of motion in the back, paraspinal tenderness, and muscle spasms in the back.[76] Dr. Horrocks' assessments were displacement of lumbar intervertebral disc without myelopathy and dysuria.[77]

### 3.  Clinic for Digestive Diseases

On May 23, 2012, plaintiff came in to be evaluated for hepatitis after an abdominal ultrasound "show[ed] diffuse increased echogenicity of the liver parenchyma nonspecific but compatible with an element of fatty infiltration and or hepatocellular disease."[78]  His physical exam was unremarkable and the impressions were abnormal liver enzymes and hypertension.[79]  Dr. Hutchinson noted that plaintiff's "enzyme elevation is suggestive of hepatocellular injury.   No suggestion of cholestatis.   Etiology uncertain but may be multifactorial.   He may have an element of alcoholic fatty liver disease.   I would like him to reduce his alcohol intake considerably.   He is willing to do so.   His ANA is positive but this is nonspecific.   Smooth muscle antibody and other lab studies will be done.   Other lab studies for chronic liver disease will be ordered as well.   Alpha-fetoprotein will be ordered.   Further recommendations will be made after I review his lab studies.   Biopsy may be

---

[76]Admin. Rec. at 513.

[77]Admin. Rec. at 513.

[78]Admin. Rec. at 317.

[79]Admin. Rec. at 318-319.

needed in the future."[80]

On June 6, 2012, plaintiff came in for a followup and reported that "[h]e feels well. No nausea or vomiting. No abdominal pain. Bowel movements are regular. No diarrhea. No melena o[r] hematochezia. He now only drinks a little bit 1 time per week. We did review his lab studies together. Smooth muscle antibody, ANA were negative. LKM, LSA were negative. TSH was normal. Immunoglobulins were normal. Alpha fetoprotein was normal. Ceruloplasmin and alpha-1 and trypsin were normal. He is not immune to hepatitis A or B. Iron saturation 34% but ferritin is 1303."[81] Plaintiff's physical exam was unremarkable; the impression was abnormal liver enzymes; and the plans was to "repeat transaminases in a few weeks and repeat ferritin as well."[82]

On July 9, 2012, plaintiff reported that "[h]e occasionally has discomfort in the right upper quadrant. He is fatigued and sleeps a lot. Denies any nausea, vomiting. He moves his bowels regularly. No melena or hematochezia. No diarrhea or constipation. He has not consumed alcohol in a couple of weeks. Recent AST was 208, ALT 194, alkaline phosphatase was 133, total bilirubin 0.4. Ferritin was 1992. Genetic studies for

---

[80]Admin. Rec. at 319.

[81]Admin. Rec. at 314.

[82]Admin. Rec. at 315.

hemochromatosis was negative."[83]   Plaintiff's physical exam was unremarkable; the impressions were abnormal liver enzymes and hypertension; and the plan was to do an ultrasound guided biopsy of plaintiff's liver.[84]

On July 16, 2012, plaintiff had an ultrasound guided biopsy of his liver.[85]

On July 23, 2012, plaintiff "denie[d] any nausea or vomiting.  He occasionally has discomfort in the upper quadrant but nothing on a chronic basis.  He does have some fatigue.  He moves his bowels regularly....  He once again explained that he has had toxic inhalation exposures many years ago and is questioning whether this could have caused his liver injury.  We did go over his liver biopsy that appeared concerning for nonalcoholic steatohepatitis.  Further iron studies are pending.  There is stage III bridging fibrosis."[86]   Plaintiff's physical exam was unremarkable and the impressions were abnormal liver enzymes, hypertension, screening malignant neoplasm colon, and right upper quadrant abdominal pain.[87]   The plan was to "start Vitamin E 1000 IU/daily and vitamin C 100 mg

---

[83]Admin. Rec. at 311.

[84]Admin. Rec. at 312-313.

[85]Admin. Rec. at 291.

[86]Admin. Rec. at 263.

[87]Admin. Rec. at 264.

a day" and plaintiff was referred to a nutritionist.[88]

On August 9, 2012, plaintiff had a colonoscopy, which revealed internal hemor-rhoids and a 6 mm polyp in the distal signoid colon.[89]  The polyp was benign.[90]

### 4.  Medical Neurology/Dr. Vehra

On December 10, 2012, plaintiff came in for his initial visit with Dr. Vehra regarding his tremors.  Dr. Vehra's physical exam was as follows:  "Appearance:  well-nourished, well developed, alert, in no acute distress, well-tended appearance, normal posture, general level of motor activity normal, cooperative during history and examination.  Mental Status Examination:  Orientation:  grossly oriented to person, place, and time.  Attention:  attention normal, concentration abilities normal.  Cranial Nerves:  Optic nerve:  vision intact bilaterally, optic discs normal bilaterally, pupillary response to light brisk[.] Oculomotor, Trochlear, and Abducens Nerves:  primary gaze normal, eye movements within normal limits, no ptosis present, no pathologic nystagmus present[.]  Trigeminal Nerve:  facial sensation normal bilaterally, masseter strength intact bilaterally[.]  Facial Nerve:  no facial weakness present.  Vestibuloacoustic Nerve:  hearing intact bilaterally.  Glossopharyngeal and Vagus Nerves:  Tongue and palate midline[.]  Spinal Accessory

---

[88]Admin. Rec. at 265.

[89]Admin. Rec. at 276.

[90]Admin. Rec. at 278.

Nerve:  shoulder shrug and sternocleidomastoid strength normal[.]  Hypoglossal Nerve:

tongue movements normal[.]  Motor Examination:  5/5, strength, normal bulk and tone

bilaterally symmetric[.]  Reflexes:  2/4 symmetric bilaterally[.]  Sensation:  Intact to light

touch, temperature, pinprick, vibration and position sense – bilaterally symmetric[.]

Cerebellar Function:  finger-to-nose-to-finger and heel-shin cerebellar tests within normal

limits bilaterally, heel-to-toe straight line walking normal[.]  Gait and Station:  normal gait,

able to stand without difficulty, negative rhomberg, kinetic tremors on right more than left

(symmetric), no cogwheeling, no bradykinesia, normal [g]ait, no micrographia."[91]  Dr.

Vehra's assessments were essential tremor, neck pain, low back pain, degeneration of

cervical intervertebral disc, and degeneration of thoracic or lumbar intervertebral disc[.][92]

The plan was to obtain an MRI of plaintiff's brain and head.[93]

A December 28, 2012, MRI of plaintiff's head showed "no evidence of intracranial

aneurysm, significant stenosis or AV malformation."[94]

A December 28, 2012, MRI of plaintiff's brain showed "[s]mall chronic conical-based

infarct at the left frontoparietal junction", "[m]inimal chronic microvascular ischemic

---

[91]Admin. Rec. at 331-332.

[92]Admin. Rec. at 332.

[93]Admin. Rec. at 332.

[94]Admin. Rec. at 333.

disease[,]" [m]ild chronic mucosal disease involving the left maxillary sinus and left ethmod air cells[,]" and "[n]o superimposed acute intracranial abnormality."[95]

On January 8, 2013, plaintiff complained of "persistent tremors, which have been chronic now gotten worse since the injury in 5/2012, generalized chronic pain on and off, neck pain with shooting sensations in the right upper and lower extremity, no falls[.] [W]ife reports that recently had an episode while he was decorating [for] Christmas ... walking up and down the ladder [and] all of the sudden he had this similar tremors weakness on the ride side, excessive sweating, lasted for 1-2 hours, and then got better no loss of consciousness. She feels his symptoms are getting wors[e]. In brief, Pt in [M]ay 2012 had trauma due to assault at his home by stranger where he suffered chin bruising and left upper arm injury, went to er at tbird[.] I did review records[.] C spine xrays [show] old ant fusion C5-7 stable with mild ddd and straightening and on LS xray with L5-S1 old surgical change with ddd mild. Left shoulder and rib xrays revealed no fxts or acute injuries."[96] Dr. Vehra's physical exam was as follows: "Appearance: well-nourished, well developed, alert, in no acute distress, well-tended appearance, normal posture, general level of motor activity normal, cooperative during history and examination[.] Mental Status Examination: Orientation: grossly oriented to person, place, and time. Attention:

---

[95]Admin. Rec. at 334.

[96]Admin. Rec. at 327.

attention normal, concentration abilities normal[.]  Cranial Nerves:  Optic Nerve:  vision intact bilaterally[.]  Oculomotor, Trochlear and Abudcens Nerves:  primary gaze normal, eye movements within normal limits, no ptosis present, no pathological nystagmus present[.]  Facial Nerve:  no facial weakness present[.]  Vestibuloacoustic Nerve:  hearing intact bilaterally[.]  Motor Examination:  5/5, strength, normal bulk and tone bilaterally symmetric, poor effort on right hand grip, tremors would resolve with lack of attention at times on and off, not on rest[.]  Sensation:  Intact to light touch, temperature, pinprick, vibration and position sense-bilaterally symmetric[.]  Cerebellar Function:  finger-to-nose-to-finger and heel-shin cerebellar tests within normal limits bilaterally, heel-to-toe straight line walking normal.  Gait and station:  normal gait, able to stand without difficulty, negative rhomberg[,]   kinetic tremors on right more than left (asymmetric), no cogwheeling, no bradykinesia, normal [g]ait, no micrographia."[97]  Dr. Vehra's assessments were essential tremor, neck pain, low back pain, degeneration of cervical intervertebral disc, and degeneration of thoracic or lumbar intervertebral disc.[98]  The plan was to have motor and sensory nerve conduction studies done, have plaintiff start taking baby aspirin, start a trial of inderal, and to stop his current blood pressure medicine.[99]

---

[97]Admin. Rec. at 329.

[98]Admin. Rec. at 329.

[99]Admin. Rec. at 329.

On January 24, 2013, Dr. Vehra advised plaintiff that "based on the normal nerve conduction EMG testing his tremors seem more like essential/volitional tremors, pain he's been describing most likely from his prior back surgery but at this time there is no evidence of any nerve impingement neuropathy or myopathy NCS/EMG- unremarkable, patient wants second opinion from his surgeon, advise him at this point I don't think it is a surgical issue, that they're more than welcome to if tremors are bothering him then I would recommend followup with a movement disorder specialist, if pain is bothering then pain management specialist, which they will think about and let me know.   From my standpoint, no further neuro testing is recommended, anxiety tops list."[100]

    B.  Examining physicians

On June 1, 2013, Stacy Donlon, M.D., examined plaintiff.  Dr. Donlon's physical exam showed that plaintiff "was well dressed and well groomed.  He was able to walk into the exam room without assistance.  He sat comfortably throughout the exam.  He was able to get on and off the exam table.  He was able to take his shoes off and put them back on.  It is noted that he tends not to move his neck during the encounter.  He was able to manipulate a safety pin and turn a doorknob using his right hand.  He is noted to have tremor affecting the right hand while doing so....  Eyes:  Pupils are equal, round, and reactive to light and accommodation.  Extraocular movements are intact.  Ears/Nose/

---

[100]Admin. Rec. at 387.

Throat:  Typmpanic membranes are pearly gray with normal anatomy.  Neck/Nodes: Supple without adenopathy, thryomegaly, or masses.  There are no palpable cervical, supraclavicular, epitrochlear, or axillary lymph nodes.  Chest/Lungs:  Symmetric with normal excursions.  Clear to auscultation throughout.  Cardiovascular:  Regular rate and rhythm.  Normal S1, S2.  No extra sounds or murmurs are heard.  There is no edema. Abdomen:  Soft with generalized tenderness and distended.  Bowel sounds positive.  No hepatosplenomegaly or masses palpated.  Pulses:  Peripheral pulses are 2+ and equal bilaterally in carotid, radial, dorsalis pedis, and posterior tibial pulses.  Coordination/Station/Gait:  Normal gait with good stride length and arm swing.  The claimant was able to tandem [walk], walk on his toes, walk on his heels, stand on one leg, and squat down without difficulty.  Romberg testing did not reveal any signs of instability.  There is no dysmetria with finger to nose, although there was notably a marked action tremor on the right upper extremity.  Assistive device:  None used or needed.  Range of Motion: Spine:  Cervical region:  This claimant was very tense during the exam on active range of motion testing of the neck.  He had overall within normal limits.  With passive range of motion testing, he was approximately 30 degrees on extension and flexion and 80 degrees on neck rotation bilaterally.  Lumbar region:  Within normal limits.  Hip Joints:  Within normal limits.  Knee Joints:  Within normal limits.  Ankle Joints:  Within normal limits. Shoulder joints:  Within normal limits.  Elbow Joints:  Within normal limits.  Wrist Joints:

Within normal limits.  Finger/thumb:  Within normal limits.  Straight Leg Raising: Negative in the seated and supine position.  Motor Strength/Muscle Bulk and Tone: Strength 5/5 in both upper and lower extremities, including bilateral grip strength.  Normal muscle bulk and tone.  Sensory Exam:  Light touch and pinprick are intact throughout the upper and lower extremities.  Deep Tendon Reflexes:  Deep Tendon Reflexes are 3+ in the bilateral upper and lower extremities.  Cranial Nerves II-XII:  Cranial Nerves II-XII are intact."[101]

Dr. Donlon opined that plaintiff could occasionally lift/carry 10 pounds; frequently lift/carry less than 10 pounds; could stand/walk for 6-8 hours; could sit for 6-8 hours; and had no limitations as to climbing, balancing, stooping, kneeling, crouching, crawling, reaching, handling, fingering and feeling.[102]

C.  Nonexamining physicians

1. Dr. Combs

On June 18, 2013, Charles Combs, M.D., opined that plaintiff could occasionally lift/carry 20 pounds; frequently lift/carry 10 pounds; stand/walk for 6 hours; sit for 6 hours; could never climb ladders/ropes/scaffolds; could occasionally climb ramps/stairs; could occasionally balance, stoop, kneel, and crouch; could never crawl; was limited as to

[101]Admin. Rec. at 462-464.

[102]Admin. Rec. at 464-466.

reaching overhead; was limited as to fingering and feeling; and should avoid concentrated exposure to extreme cold and vibration.[103]

### 2.  Dr. Griffith

On September 26, 2013, Ernest Griffith, M.D., opined that plaintiff could occasionally lift/carry 20 pounds; frequently lift/carry 10 pounds; stand/walk for 6 hours; sit for 6 hours; never climb ladders/ropes/scaffolds; occasionally climb ramps/stairs; occasionally balance, stoop, kneel, and crouch; never crawl; was limited as to overhead reaching, fingering, and feeling; and should avoid concentrated exposure to extreme cold, vibration, and hazards.[104] Dr. Griffith considered Dr. Donlon's opinion but noted that it "appears to rely on the assessment of limitations resulting from an impairment for which the source has not treated or examined the individual.  The CE's examiner's opinion is an overestimate of the severity of the individual's restrictions/limitations and based only on a snapshot of the individual's functioning."[105]

### II.  Mental Impairments

#### A.  Examining Sources

On May 29, 2013, Greg A. Peetoom, Ph.D., examined plaintiff.  Dr. Peetoom

---

[103]Admin. Rec. at 63-64.

[104]Admin. Rec. at 82-83.

[105]Admin. Rec. at 87.

observed that plaintiff "was alert and cooperative, easily engaged. Posture was erect. Gait was normal. Stiff movements of his neck were observed. Right hand tremor was observed. It was particularly noticeable during writing and drawing tasks."[106]   Plaintiff's mental status exam was as follows: "The claimant scored 30/30 points on the MMSE. He moved through the tasks efficiently. 'Don't let the little things worry ya,' was his interpretation of the 'spilled milk' proverb. He interpreted the 'glass houses' proverb as 'be careful what you say so you do not be judged yourself.' The claimant correctly calculated two of two simple math word problems. If he suddenly smelled smoke from a fire while sitting in a crowded movie theater he would, 'evacuate.' 'Put in a mailbox,' is what he would do if he found on the sidewalk a sealed, addressed, and newly stamped envelope. Good eye contact.... Speech was normal in rate, amplitude and fluency. Comprehension was good. Stream of thought was linear and goal-directed. Thought content was pertinent. There was no suggesting of perceptual abnormalities. Range of affect was normal. Mood was euthymic. He was fully oriented. Intellectual ability was estimated to be in the average range. Judgment was good; insight was fair."[107]   Dr. Peetoom's Axis I diagnosis was adjustment disorder with mixed anxiety and depressed mood; and his prognosis was that plaintiff "reported some mild, intermittent symptoms of depression and anxiety. Those

---

[106]Admin. Rec. at 453.

[107]Admin. Rec. at 455-456.

symptoms do not appear to significantly impede his ability to function.  Prognosis at this time appears to be fair."[108] Dr. Peetoom's summary and conclusions were as follows: "The claimant stated he is unable to sustain employment due to chronic physical pain and physical limitations.  He did report some minor symptoms of depression and anxiety that seemingly are secondary to his medical issues and his unemployment status.  The claimant is able to function independently.  Cognitive functioning was grossly intact during this evaluation.  He had no difficulty interacting with this examiner.  Any impediments to employability at this time are more likely to be related to medical issues than [to] psychological issues."[109]

Dr. Peetoom opined that plaintiff had no limitations as regards understanding and memory, sustained concentration and persistence, social interaction, and adapting to change.[110]

### B.  Nonexamining sources

### 1.  Dr. Lazorwitz

On June 3, 2013, Nicole Lazorwitz, Psy.D., opined that plaintiff's anxiety disorder

---

[108]Admin. Rec. at 456.

[109]Admin. Rec. at 456.

[110]Admin. Rec. at 457.

was non-severe.[111]

## 2. Dr. Zuess

On September 24, 2013, Jonathan Zuess, M.D., opined that plaintiff's anxiety disorder was non-severe.[112]  Dr. Zuess opined that plaintiff had only mild restrictions of activities of daily living and mild difficulties in maintaining concentration, persistence, or pace.[113]

## Other Evidence

### I.  Plaintiff's Reports

In an undated exertional daily activities questionnaire, plaintiff reported that on an average day, he watches movies, lays down or reclines, reads, and that he helps fold clothes once a week.[114]  Plaintiff reported that his "[m]edication prevents me from driving due to pain cannot sit, stand or lay down for long periods of time."[115]  He reported that he could not "walk very far without pain.  Can walk to mail box 300 feet."[116]  He reported that

---

[111]Admin. Rec. at 58.

[112]Admin. Rec. at 79-80.

[113]Admin. Rec. at 79.

[114]Admin. Rec. at 203.

[115]Admin. Rec. at 203.

[116]Admin. Rec. at 203.

he could lift a light grocery bag and a light pile of folded laundry.[117]  Plaintiff reported that

he could no longer do yardwork or pool maintenance.[118]  Plaintiff reported that he could

drive a car for 20 miles if not on his pain medication.[119]  He reported that he sleeps 4 to 6

hours in the evening but takes naps every 2 hours during the day.[120]  Plaintiff stated that

"pain prevents me from having a normal life.  [D]ue to tremors cannot write well.  Had to

have wife help fill this paper wk out."[121]

On July 1, 2013, plaintiff reported that he had "increased pain despite decompres-

sion surgery and fusion.  [He] report[ed] loss of range of motion in the head and neck.  [He]

reports increasing difficulty with right hand tremors [and] increasing need for pain

medications which result in side effects including dizziness, fatigue, and nausea[.]"[122]

Plaintiff reported that he had "limited mobility and decreased ability to perform daily

activities.  He has been having problems with gripping and grasping.  [He] reports he is not

comfortable in any position for any extended length of time.  He spends most of the day

alternating from sitting, standing, and lying down.  Tremors in the right hand have

---

[117]Admin. Rec. at 204.

[118]Admin. Rec. at 204.

[119]Admin. Rec. at 204.

[120]Admin. Rec. at 204.

[121]Admin. Rec. at 205.

[122]Admin. Rec. at 209.

increased since the cervical fusion performed on 5/16/13. [Plaintiff] reports decreased range of motion in his neck."[123]  Plaintiff reported that "since surgery it takes [him] much longer to complete daily activities including dressing and bathing. [He] is unable to engage in any meal preparation due to tremors and pain.  Sometimes his right hand tremors force him to use his left hand to eat.... [He] has less stamina and endurance overall for any activities due to chronic pain and discomfort.  [He] also has increasing problems with concentration due to pain and narcotic medications side effects.  [He] recently attempted to sit through a two hour movie and was unable to due to pain and difficulty sitting in one position.  He requires the constant ability to alternate positions and even lay down to alleviate pain.  Tremors, pain, and weakness include any repetitive motion of his hands and arms.  [Plaintiff] has extremely limited ability to lift and carry and should not lift anything more than 5lbs per doctor order."[124]

In an undated function report that was completed by plaintiff's wife for him, plaintiff reported that his average day consists of "have breakfast, take pain medication, watch TV, sit outside, lay down.  Have lunch, take pain medication, watch TV, sit outside, stand a little, then lay down.  Have dinner.  Watch TV, sit outside, stand a little, and lay

---

[123]Admin. Rec. at 209.

[124]Admin. Rec. at 213.

down."[125]  Plaintiff reported that he could "only sleep in 1 to 2 hour increments[.]"[126]  He

reported that his personal care takes longer than it used to and that he has to use his left

hand frequently and that he cuts himself shaving due to hand tremors.[127]  He reported that

he does not prepare meals, that on a good day he can help with laundry, that he goes

outside four times a day to sit, that he can only drive when not on pain medications, and

that he goes grocery shopping once a week for 30 minutes.[128]  Plaintiff reported that he is

"unable to do a lot that [I] use to do.  Have become a little depressed and on high pain days

stay away from people because [I] am grumpy."[129]  Plaintiff reported that he could lift 5

pounds, stand for 15-20 minutes, walk 2-3 blocks, sit for 20-30 minutes; that squatting,

bending, reaching, and climbing increased his pain; and that he has problems with blurred

vision due to medication.[130]  Plaintiff reported that he can pay attention for one hour, can

follow written and spoken instructions fair to poor because of difficulty focusing and

concentrating due to pain medication, gets along with authority figures fair when in pain,

---

[125]Admin. Rec. at 217.

[126]Admin. Rec. at 217.

[127]Admin. Rec. at 218.

[128]Admin. Rec. at 218-219.

[129]Admin. Rec. at 221.

[130]Admin. Rec. at 221.

handles stress poorly, and handles changes in his routine poorly.[131]  Plaintiff reported that "due to my injuries my quality of life has had significant changes.  Everyday [I] feel frustrated because [I] can no longer do what [I] use to do.  It has been very difficult to accept my limitations."[132]

On October 4, 2013, plaintiff reported "increased pain and secondary depression. [He] has worsening of symptoms in his right arm and hand including tremors, weakness, and radiating pain from his neck.  He is unable to perform fine manipulations with his hand including writing, typing and or repetitive motions li[k]e eating or bathing."[133] Plaintiff reported "increased problems with personal grooming due to pain. Sometimes he is in so much pain he is unable to bathe himself and he experiences overwhelming fatigue with simple activities of da[ily] living including self grooming.  [He] has less and less capacity for activity due to pain and discomfort.  [He] reports disturbed sleep and inability to sit, stand, walk or lay for any extended periods of time."[134]

II.  Linda Lundgren

In an undated report, Lundgren wrote:  "I ... have known Scott Wilber for 3 years

---

[131]Admin. Rec. at 221-222.

[132]Admin. Rec. at 223.

[133]Admin. Rec. at 225.

[134]Admin. Rec. at 228.

or more.  I met him when I went to work for TGIF's.  He was a waiter.  An excellent waiter. Fast on his feet, could carry more plates than me.  We use to play darts, shoot pool, go bowling and travel with my husband & him and his wife.  Since he got hurt, he can no longer do any of these things.  He can't sit for very long, can't stand for very long.  Can no longer take long trips in a car.  He has [tremors] so bad can hardly hold anything.  It saddens me to see such a vibrant young man be in so much pain and unable to live his life to the fullest."[135]

The Hearing

I.  Plaintiff

Plaintiff testified that there was no significant improvement in his pain or tremors after the cervical revision fusion in 2013.[136]  Plaintiff testified that he still gets tremors in his right side and that he gets them when trying to write or eat.[137]  Plaintiff testified that Dr. Kellogg told him in May 2013 that there was nothing he could do for plaintiff's neck.[138] Plaintiff testified that he has pain in his neck and lower back and pain that radiates down

---

[135]Admin. Rec. at 254.

[136]Admin. Rec. at 33-34

[137]Admin. Rec. at 34.

[138]Admin. Rec. at 42.

his legs and into his hands.[139]  Plaintiff testified that on a typical day his pain is a 7.[140]

Plaintiff testified that his medications cause drowsiness and the inability to concentrate.[141]  Plaintiff testified that it has been recommended that he do stretching which he tries to do at home.[142]

Plaintiff testified that he gets frequent headaches, about four times a week.[143]  He testified that his headaches last all day and that the only way to get relief is to "lay down and close my eyes and just lay in bed."[144]

Plaintiff testified that he cannot sit for very long and that he needs to get up and move a little bit after sitting for awhile.[145]  Plaintiff testified that he can sit for 15-20 minutes at a time.[146]  Plaintiff testified that he cannot walk very far, maybe a block.[147]  He testified

---

[139]Admin. Rec. at 43.

[140]Admin. Rec. at 44.

[141]Admin. Rec. at 36.

[142]Admin. Rec. at 36.

[143]Admin. Rec. at 43.

[144]Admin. Rec. at 43.

[145]Admin. Rec. at 34.

[146]Admin. Rec. at 39.

[147]Admin. Rec. at 36.

that he can stand for about 15 minutes.[148]  Plaintiff testified that he could lift 3-4 pounds with his right arm and 10-15 with his left.[149]  He testified that he has difficulty grasping with his right hand and that he would not be able to do repetitive motions with his right arm for even an hour or two during the day.[150]  Plaintiff testified that he has difficulty with balance, twisting and bending.[151]

Plaintiff testified that "[t]he best thing for me is to lay flat on my back" and that he spends "at least 80 percent of my day flat on my back."[152]  Plaintiff testified that he reads and watches a lot of TV.[153]

Plaintiff testified that he can dress himself as long as he is very careful.[154]  Plaintiff testified that he could not do yard work or skim the pool.[155]  Plaintiff testified that he has difficulty sleeping at night and that he sleeps between 4-5 hours during the daytime.[156]

---

[148]Admin. Rec. at 39.

[149]Admin. Rec. at 37.

[150]Admin. Rec. at 38.

[151]Admin. Rec. at 44-45.

[152]Admin. Rec. at 34.

[153]Admin. Rec. at 35.

[154]Admin. Rec. at 34-35.

[155]Admin. Rec. at 35.

[156]Admin. Rec. at 40.

Plaintiff testified that since he stopped working his condition has gotten worse in terms of pain, tremors, and his inability to do things.[157]

II.  Vocational Expert

Kathy Atha testified as the vocational expert.  The ALJ gave Atha a hypothetical person who could do light work "with the right lower extremity limited to frequent operating of foot controls, no climbing of ladders, ropes or scaffolds, ... no crawling, occasional climbing [of] ramps or stairs, occasional balancing, occasional stooping, crouching, kneeling and crawling, overhead reaching would be limited to only occasional, bilateral handling and fingering is limited to frequent, he has to avoid concentrated exposure to non-weather related extreme cold, has to avoid concentrated exposure to excessive vibration, dangerous machinery with  moving mechanical parts, except for vehicles, and unprotected heights that are high or exposed."[158]  Atha testified that such a person could work as a waiter, bartender, or real estate agent.[159]

The ALJ then added the limitation that the person could only occasionally lift up to 10 pounds and frequently lift less than 10 pounds, and Atha testified that such a person

---

[157]Admin. Rec. at 35.

[158]Admin. Rec. at 47.

[159]Admin. Rec. at 48.

could work as a real estate agent.[160]

Next, the ALJ gave Atha a hypothetical person who had all the limitations set out in the first hypothetical except the person was limited to sedentary work instead of light work; and Atha testified that such a person would not be able to do any of plaintiff's past relevant work.[161]  Atha testified that such a person would be able to work as an order taker.[162]

The ALJ then added to the third hypothetical the limitation that the person would have to lay down for at least 4 to 5 hours in an eight-hour work day; and Atha testified that there would be no work for such a person.[163]

Plaintiff's counsel then asked if the person could only grasp and twist 25 percent of the time with the right hand and could only reach overhead 25 percent of the time, whether he could still work as an order taker.[164]  Atha testified that with those limitations, the person would not be able to work as an order taker.[165]

---

[160]Admin. Rec. at 48.

[161]Admin. Rec. at 49.

[162]Admin. Rec. at 49.

[163]Admin. Rec. at 49-50.

[164]Admin. Rec. at 50.

[165]Admin. Rec. at 50.